IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

RICHARD VAUGHN, JR., individually and
as Personal Representative for
the Estate of Teresa Vaughn,
RICHARD L. VAUGHN, SR.,
MARJO VAUGHN, LARRY VAUGHN,
DEBRA BLANK, and VIVIAN KIMBOL,

        Plaintiffs,

    v.

KLAMATH COUNTY FIRE DISTRICT NO. 1,
GREGORY DAVIS, DR. JAKOB FREID,
CODY ENGLER, and ALEX DUSTIN,

        Defendants.

Case No. 1:22-cv-00161-CL

**OPINION AND ORDER**

---

**CLARKE**, Magistrate Judge.

Plaintiffs represent the family and Estate of now-deceased, Teresa Vaughn. They bring

this action against Defendants Klamath County Fire District No. 1, Gregory Davis, Cody Engler,

and Alex Dustin (collectively, "KCFD Defendants") and Defendant Dr. Jakob Freid ("Dr. Freid")

for claims arising out of a 911 response. Before the Court is KCFD Defendants' Motion for

Summary Judgment, ECF No. 62, and Dr. Freid's Motion for Summary Judgment, ECF No. 63.

The Court held oral argument on February 27, 2024. All parties consent to jurisdiction by a U.S.

Magistrate Judge. *See* ECF No. 37. For the reasons below, the Motions are GRANTED and

DENIED in part.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*). The court cannot weigh the evidence or determine the truth; it may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## BACKGROUND

This case arises out of the death of Teresa Vaughn ("Ms. Vaughn"). Plaintiffs are Richard Vaughn, Jr. (decedent's brother and personal representative of her Estate), Vivian Kimbol (domestic partner), Marjo Vaughn (mother), Richard Vaughn, Sr. (father), Larry Vaughn (brother), and Debra Blank (sister). SAC, ECF No. 59 at ¶ 7.

Ms. Vaughn tested positive for Covid-19 on December 21, 2020. Mylander Decl., ECF No. 71-1 at 12, 14.[1] Her partner, Ms. Kimbol, tested negative. *Id.* Ms. Vaughn's symptoms remained generally mild until the morning of December 26, at which point they appeared to escalate dramatically. *Id.* at 15. According to Ms. Kimbol, Ms. Vaughn awoke with difficulty breathing and she struggled to navigate the stairs of their apartment, unable to grip her water bottle and purse and requiring Ms. Kimbol's assistance. *Id.* After setting Ms. Vaughn down in a chair to call her sister, Ms. Kimbol called 911. *Id.* at 16. She told the dispatcher her "roommate was having difficulty breathing, and that she had tested COVID positive, and that [they] needed 9-1-1." *Id.* at 17. At this time, Ms. Kimbol contends that Ms. Vaughn was gasping on the phone with her sister, only able to respond with an "uh-huh" or a "yes." *Id.*

KCFD paramedic, Defendant Cody Engler, arrived five to ten minutes later in full personal protective equipment. *Id.* at 18–19. He claims Ms. Kimbol communicated through the door that Ms. Vaughn had Covid for a week, was feeling shaky, and wanted to go to the hospital to get checked out. ECF No. 71-3 at 13. Ms. Kimbol placed masks on herself and Ms. Vaughn, and Engler entered the apartment enough to glance at Ms. Vaughn in the chair. ECF No. 71-1 at 20. His account of Ms. Vaughn's condition differs from Ms. Kimbol's. Engler claims that from looking at Ms. Vaughn and briefly speaking to her, he was able to conclude there were no signs of respiratory distress or increased respiratory rate, she was not tripoding or breathing shallow, and her skin showed positive signs of being pink, warm, and dry. ECF No. 71-3 at 13. Engler asked a few questions about Ms. Vaughn's symptoms and condition, and he inquired as to how she got down the stairs, to which Ms. Kimbol answered that she assisted. ECF No. 71-1 at 22–23. It's unclear exactly when he raised it, but at some point early into the visit Engler asked Ms.

---

[1] Page numbers correspond to ECF pagination.

Kimbol if she was willing to drive Ms. Vaughn to the hospital in her own vehicle, claiming it was encouraged at the time to limit exposure.[2] *Id.* at 20; ECF No. 71-3 at 16. Ms. Kimbol contends she responded: "Isn't that your fucking job? I wouldn't have called you." ECF No. 71-1 at 21.

A second KCFD paramedic, Defendant Alex Dustin, came to the doorway with a medical bag. *Id.* at 24, 39. According to Ms. Kimbol, Engler stopped Dustin from entering and explained that Ms. Kimbol would be providing transport. *Id.* at 24. Engler verbally confirmed with Ms. Vaughn that it was alright for Ms. Kimbol to take her, to which she responded, "I guess so." *Id.* at 25. The two women then got up and headed out of the apartment with Ms. Kimbol physically supporting Ms. Vaughn the entire way. *Id.* at 26. As they approached the car, Ms. Vaughn dropped to the step and started to fall sideways. *Id.* Dustin steadied her and helped walk Ms. Vaughn the rest of the way to her car. *Id.* He put her seatbelt on and retrieved her slipper, which had fallen off in the process. *Id.* Engler, meanwhile, canceled the oncoming engine en route with defibrillators, medical equipment, and three more senior paramedics. ECF No. 71-3 at 12. Once the women were in their car, Engler and Dustin got back into the ambulance. Ms. Kimbol began driving towards the hospital; the paramedics began driving the opposite direction. ECF No. 71-1 at 27.

Approximately three-tenths of a mile down the road, Ms. Vaughn suffered a cardiac event. *Id.* at 29. She and Ms. Kimbol arrived at the emergency room approximately eight minutes later, at which point Ms. Vaughn had lost consciousness and wasn't breathing. *Id.* at 30. Hospital personnel met the car in the ambulance bay, retrieved Ms. Vaughn, and began administering CPR and oxygen. *Id.* at 31. Ms. Vaughn's brother and sister arrived later, but Ms. Kimbol, not permitted to enter the hospital due to her Covid-19 exposure, returned home alone. *Id.* at 31–32.

---

[2] Ms. Kimbol maintains that it was the first thing Engler said when he arrived. ECF No. 71-1 at 21, 36.

The doctors were able to revive Ms. Vaughn, but they could not keep her alive without ventilator support. *Id.* at 33. The family, with Ms. Kimbol's counsel, made the decision to end life support a short while later. *Id.*

Defendant Fire Chief Gregory Davis and Deputy Chief Matthew Hitchcock visited Ms. Kimbol the next day. *Id.* at 34. They were apologetic and asked a few questions regarding the incident. *Id.* at 35. Ms. Kimbol recounted the previous night's events and informed the men that neither she nor Ms. Vaughn signed a waiver refusing ambulance transport. *Id.* at 36. Ms. Kimbol asserted that had such a waiver been offered to her, she would not have signed it. *Id.*

From March 2020 through September 2021, Defendant KCFD cycled through approximately ten different Covid-19 directives. ECF No. 62-1 at 73–164. These standing orders, which were routinely updated consistent with developing information on the virus, were intended to mitigate any risk of spreading the disease for the protection of first responders and the community being served. ECF No. 62 at 8. According to the testimonies of Fire Chief Devon Brown and Defendants Engler, Dustin, and Dr. Jakob Freid,[3] the District provided constant training with every changing directive. ECF No. 62-1 at 169, 172–74, 183, 188–89.

At issue here is an unsubstantiated directive called "provider-initiated refusal" ("PIT"). PIT allegedly provided a temporary option during Covid that permitted patients to transport themselves in order to reduce exposure. Prior to determining whether self-transport was appropriate, emergency medical services ("EMS") personnel were required to obtain a signed and witnessed refusal form and conduct a primary and secondary assessment of the patient. ECF No. 71-3 at 4–6; *see also* Freid Mot., ECF No. 63 at 15. Any type of pressure or encouragement

---

[3] Dr. Jakob Freid, M.D. is the medical director for KCFD. Freid Answer, ECF No. 61 at ❡ 14. He is responsible for reviewing and, if necessary, annually updating KCFD's standing orders for emergency medical service personnel. Calhoun Decl., ECF No. 64 at 6.

exerted to coax a patient into electing self-transport was prohibited. ECF No. 71-24 at 3. The origins of PIT have not been determined, but all parties acknowledge that it existed at some point, until it was rescinded in the Sixth Edition Directive. ECF No. 62-1 at 111. PIT was not reintroduced in the Seventh Edition Directive—the controlling directive in December 2020—and therefore, PIT was not in place when Ms. Vaughn called 911. *Id.* at 119–20; *see also* 186–87. The Seventh Edition, like many of the previous KCFD directives, provided guidance on additional Covid-19 safety protocols, applicable to all patient encounters regardless of Covid diagnosis, as well as additional measures to reduce risk of spread when exposure to the virus was known or suspected. ECF No. 62-1 at 116–31.

According to Defendant Engler, he was operating under the assumption that PIT was still in effect when he responded to Ms. Vaughn's 911 call and encouraged her and Ms. Kimbol to drive themselves. ECF No. 71-3 at 14, 18; *see also* ECF No. 71-6. Engler also acknowledged, however, that under PIT, he was still required to obtain a signed and witnessed refusal form and perform a primary and secondary assessment, both of which he failed to do. ECF No. 71-3 at 4–5, 15, 17. Following KCFD's investigation of this incident, Dustin received an oral reprimand, *see* ECF No. 71-16, and Engler received a 19-hour unpaid suspension, *see* ECF No. 71-15.

## PROCEDURAL BACKGROUND

Plaintiffs filed this lawsuit on January 31, 2022, alleging federal civil rights claims and state negligence claims.

Defendants John Does 1-10, Jane Does 1-5, and Stephen Hedlund were dismissed from this action on January 10, 2023. *See* FAC, ECF No. 32. Defendant Matthew Hitchcock was dismissed on April 20, 2023. *See* Order, ECF No. 42.

The Second Amended Complaint alleges eleven claims in total on behalf of all Plaintiffs: (1) a § 1983 claim against Engler and Dustin; (2) a § 1983 *Monell* claim against KCFD; (3) a § 1983 supervisor liability claim against Chief Davis and Dr. Freid; (4) an Americans with Disabilities Act claim and (5) a Rehabilitation Act claim against KCFD; (6) a negligence claim, (7) a gross negligence/reckless misconduct claim, and (8) a negligence/lost chance claim against all Defendants; (9) IIED or NIED claims against all Defendants, except Dr. Freid; (10) a wrongful death action against all Defendants; and (11) a survival action against all Defendants. ECF No. 59.

## DISCUSSION

KCFD Defendants, Davis, Engler, Dustin, and KCFD, and Defendant Dr. Freid each move for summary judgment and adopt by reference the other's motion. Because every claim has been challenged in some way, the Court walks through each to assess whether it can survive summary judgment.

As a preliminary matter with respect to the First, Second, and Third Claim for Relief, only the Estate and the and the parents of Ms. Vaughn are permitted to bring a § 1983 claim on her behalf.[4] Defendants' Motion to dismiss the remaining Plaintiffs for lack of subject matter jurisdiction is therefore granted. Plaintiffs Larry Vaughn, Debra Blank, Vivian Kimbol, and Richard Vaughn, Jr., in his individual capacity, are dismissed from the First, Second, and Third Claims for Relief.

---

[4] The Fourteenth Amendment protects personal rights, which generally cannot be asserted vicariously. *Rhomberg v. Wilson*, No. 95-16244, No. 95-16257, 1997 U.S. App. LEXIS 3052, at *6 (9th Cir. Feb. 18, 1997). The Ninth Circuit, however, has recognized a cognizable liberty interest for parents and children in similar § 1983 cases brought by families of the deceased; the interest does not apply for sibling relationships. *Ward v. San Jose*, 967 F.2d 280, 284; *see also J.P. v. Cty of Alameda*, 803 F. App'x 106, 109 (9th Cir. 2020).

I.    **First Claim for Relief: § 1983 claim against Engler and Dustin, individually.**

Plaintiffs Marjo Vaughn, Richard Vaughn, Sr., and the Estate allege that Defendants Engler and Dustin are liable under § 1983 for their deliberately indifferent actions that placed Ms. Vaughn in state-created danger.

a. *Section 1983*

A Section 1983 claim requires a plaintiff must show (1) a violation of a (3) constitutional right (2) committed by a person acting under color of state law. *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). Plaintiffs here claim that Defendants violated the Fourteenth Amendment, which provides "[n]o State shall…deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

The Due Process Clause of the Fourteenth Amendment acts "as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).

Consistent with these principles, the general rule is that a state is not liable for its omissions. *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000). However, a state's "omission or failure to protect" may violate the Fourteenth Amendment if one of two exceptions apply. *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011). Plaintiffs here rely on the state-created danger exception.

### b. *State-created danger*

The state-created danger exception arises "when a state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger.'" *Id.* Thus, to survive summary judgment, Plaintiffs must raise a question of fact as to whether Defendants Engler and Dustin (1) affirmatively placed Ms. Vaughn in danger (2) by acting with deliberate indifference to a foreseeable risk. The Court finds they have.

First, in examining whether the state affirmatively placed a person in danger, we examine whether the state actor "left the person in a situation that was more dangerous than the one in which they found him." *Munger*, 227 F.3d at 1086. Plaintiffs here claim Engler and Dustin acted affirmatively in the following ways: signaling to Dustin not to proceed into the house with medical instruments or conduct any further examination on Ms. Vaughn; canceling the oncoming engine equipped with superior aid, tools, and experienced EMS workers; walking Ms. Vaughn 25 feet to her car, when she was visibly stumbling and unable to ambulate independently; and driving the ambulance in the opposite direction rather than following Ms. Vaughn and Ms. Kimbol to the hospital, as was standard procedure. Interpreting these facts in the manner most favorable to Plaintiffs, reasonable minds could differ as to whether these were affirmative state actions that resulted in Ms. Vaughn being placed in arguably the least equipped situation with the farthest access to medical aid following harmful, unnecessary physical exertion.

Defendants argue that the referenced conduct is more properly framed as inaction, or a failure to act, rather than actual affirmative action. In *Penilla v. City of Huntington Park*, 115 F.3d 707 (1997), the decedent was found in grave medical condition and the officers nonetheless moved him inside, locked the door, and left. That was a clear example of affirmative state action creating a danger. To Defendants' point, the Court agrees that the facts of this case do not present

as clear an example as *Penilla*. However, they also do not present a clear antithesis, where the defendants merely do nothing upon arrival. The testimony is undisputed that Engler and Dustin did not merely show up and leave; they took some active steps which resulted in a change in circumstances for Ms. Vaughn. It is arguable that, like *Penilla*, Defendants' actions cut Ms. Vaughn off from receiving immediate medical attention. Further, a dispute exists as to the degree of those steps, such as how much of a visual assessment was or was not made by Engler and how poor or alarming Ms. Vaughn's condition was upon arrival. Ms. Kimbol also asserts that had Engler not encouraged them to transport themselves as he did, she would have pursued other medical aid through her employing hospital, thereby avoiding the car ride but for Engler's encouragement. In light of such dispute, the Court finds that Plaintiffs have raised a genuine question as to whether Engler and Dustin's conduct crossed from mere inaction into affirmative action that placed Ms. Vaughn in a worse circumstance than she otherwise would have found herself in.

The second step for the exception to apply examines whether the state acted with "deliberate indifference" to a "known or obvious danger." *Patel*, 648 F.3d at 974. Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). The state actor must recognize the unreasonable risk and intend to expose the person to it, without regard to any consequences to the person. *Sinclair v. City of Seattle*, 61 F.4th 674, 680 (2023). "The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state." *Patel*, 648 F.3d at 974.

Plaintiffs here have presented evidence that Engler and Dustin knew of Ms. Vaughn's Covid-19 diagnosis, were responding to her 911 call requesting urgent assistance, saw her in a

state where she could barely breath or walk on her own, and still, they chose to cut off further aid and abandon Ms. Vaughn and Ms. Kimbol. Drawing all inferences in Plaintiffs' favor, reasonable minds could differ regarding whether Defendants actions rose beyond mere negligence to deliberate indifference to the known danger presented by Ms. Vaughn's condition. The Court is further mindful that the danger and uncertainty surrounding Covid-19 in December 2020 was significantly heightened compared to our current understanding in 2024.

Defendants point out in their Reply that "Plaintiffs have not provided controlling authority indicating that the Ninth Circuit has applied the state-created danger exception to circumstances where both (1) a third-party private harm is not involved, and (2) an official is acting to provide emergency medical services." KCFD Reply, ECF No. 75 at 14. They further highlight that sister courts have been careful to distinguish between EMS personnel functioning in a law enforcement capacity from EMS personnel functioning in a medical provider capacity.

The Court respects this position and is reluctant to extend the state-created danger exception in the context of an EMS home visit. There is, however, no clear authority that would preclude application of the exception to EMS workers in a unique circumstance, such as the one presented by Plaintiffs here. Moreover, there is enough factual dispute to allow a full presentation of the facts at trial. The Court can then better evaluate whether the state-created danger exception should apply in this context. The Court will be open to a directed verdict motion on this issue at trial.

### c. *Qualified immunity for Engler and Dustin*

Defendants Engler and Dustin also raise a defense of qualified immunity.

A plaintiff attempting to overcome the presumption of qualified immunity must first show the constitutional right was clearly established. *Gasho v. United States*, 39 F.3d 1420, 1438

(9th Cir. 1994) The burden then shifts to the defendant to show that a reasonable state actor "could have believed, in light of the settled law, that he was not violating a constitutional or statutory right." *Id.* (original citations omitted). "Summary judgment on qualified immunity is not proper unless the evidence permits only one reasonable conclusion. Where 'conflicting inferences may be drawn from the facts, the case must go to the jury.'" *Munger*, 227 F.3d at 1087 (quoting *LaLonde v. County of Riverside,* 204 F.3d 947, 959 (9th Cir. 2000)).

While the particular facts of this case present a somewhat novel application of the state-created danger exception, the right to be free from state-created danger is, and has been, a clearly established constitutional right. Given the possibility of conflicting inferences, the Court declines to grant Defendants qualified immunity as a matter of law. Moreover, significant disputes of fact exist in this case creating uncertainty as to whether Engler and Dustin knew of the danger they were creating with their actions. If appropriate, Defendants are entitled to move for directed verdict at the close of trial.

Plaintiffs have met their burden of demonstrating a genuine issue of material fact. Defendants' motion for summary judgment on Plaintiffs' First Claim for Relief is therefore denied.

## II.    Second Claim for Relief: § 1983 *Monell* claim against KCFD.

Plaintiffs allege that Defendant KCFD is liable as a municipality under § 1983 for its enforcement of the PIT directive and other unnamed "policies, customs, and practices" arising out of Covid-19.

A local governing body may be held liable under § 1983 when an action, pursuant to some "official policy," causes a constitutional tort. *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 692 (1978). The "official policy" requirement distinguishes acts of the

municipality from acts of its employees, thereby ensuring "municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). *Monell* liability therefore excludes any liability based on respondeat superior or vicarious liability. *Monell*, 436 U.S. at 692.

To prevail, "a plaintiff must show that a 'policy or custom' led to the plaintiff's injury." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016) (quoting *Monell*, 436 U.S. at 694). A direct causal link between the policy or custom and the alleged constitutional deprivation is required. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). A plaintiff must further show that the policy or custom reflects "deliberate indifference" to the public's constitutional rights. *Castro*, 833 F.3d at 1073 (citing *City of Canton*, 489 U.S. at 392). The circumstances in which *Monell* liability may be found are "carefully circumscribed" accordingly. *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995).

For liability to attach in this circumstance, Defendant KCFD must have enforced a constitutionally deficient policy or custom that directly caused Ms. Vaughn's injury. The PIT directive upon which Plaintiffs rely has not been provided in the record. However, even allowing Plaintiffs the inference that PIT existed as alleged, it merely shows that KCFD temporarily offered an optional means of transport in deference to a priority of limiting exposure between Covid-positive patients and first responders. It does not reflect deliberate indifference to constitutional rights. Of the numerous policies that KCFD has produced for the record, the Court finds that none reflect deliberate indifference to the community's constitutional rights, including every edition of Covid-19 directive that was operative before, during, and after the timeline implicated by this case. The testimony from KCFD's officers and employees likewise provides no indication that any unconstitutional customs were practiced on a district-wide basis.

Without demonstrating that KCFD employed an unconstitutional policy or custom, Plaintiffs cannot establish the requisite causal link to Ms. Vaughn's alleged harm. Yet, even if Plaintiffs could demonstrate that PIT was somehow unconstitutional, Defendant Engler nonetheless acknowledged that he failed to follow policy by not assessing vitals or obtaining a refusal waiver. The link to some official policy ensuring that *Monell* claims do not arise from respondeat suprerior is therefore interrupted here by Engler's noncompliant actions.

The remaining allegations supporting this claim are insufficiently isolated and unsupported. Without proof that some violation occurred as part of a systemic pattern, Plaintiffs' allegations are fatally confined to the incident that occurred with Ms. Vaughn. And sporadic, isolated incidents cannot support imposing *Monell* liability. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Summary judgment is granted in Defendants' favor on Plaintiffs' Second Claim for Relief.

**III.   Third Claim for Relief: § 1983 supervisor liability against Chief Davis and Dr. Freid.[5]**

Plaintiffs allege that Defendants Chief Davis and Dr. Freid are liable as supervisors under § 1983 for their unconstitutional policies, their failure to adequately train, and their insufficient responses to constitutional violations.

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.

---

[5] Plaintiffs' Second Amended Complaint also names Defendants Hitchcock and Does 3-5 in the Third Claim for Relief. Both Defendants were previously dismissed from this action. The Court construes this as error.

1989)). Liability can arise from a supervisor's own culpable action or inaction in training,

supervising, or controlling subordinates; from acquiescence to the constitutional deprivations

complained of; or from conduct showing a reckless or callous indifference to the constitutional

rights of others. *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005) (quoting *Larez v.*

*City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)). Setting in motion a series of acts by

others or knowingly refusing to terminate a series of acts by others, which they knew or

reasonably should have known would cause others to inflict constitutional injury, can also give

rise to supervisor liability under § 1983. *Starr*, 652 F.3d at 1208 (quoting *Dubner v. City & Cnty.*

*of San Francisco*, 266 F.3d 959, 968 (9th Cir.2001)).

       To prevail, a plaintiff must show the supervisor breached a duty to the plaintiff which was

the proximate cause of the injury. *Id.* at 1207.

       The record here cannot support Plaintiffs' allegations that Defendants Davis and Freid

knowingly "allowed, approved, and ratified" unconstitutional policies and otherwise failed to

adequately train KCFD1 employees.

       First, none of KCFD's policies provided in the record reflect unconstitutional policies.

With respect to Plaintiffs' argument that Dr. Fried may be held liable for the implementation of

PIT, "a policy so deficient that the policy 'itself is a repudiation of constitutional rights' [and]

'the moving force of the constitutional violation,'" the Court is unpersuaded. Pls. Resp., ECF No.

70 at 12; *see also Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991). Plaintiffs

cannot substantiate the PIT directive nor prove that it came from Dr. Freid. Even still, the Court

has already explained that such a directive does not constitute a repudiation of constitutional

rights.

Secondly, Plaintiff is unable to point to any testimony, declarations, or other evidence that shows Defendants were constitutionally inadequate in their training. To the contrary, multiple Defendants have testified that they were trained with each new directive and were familiar with the standing orders and procedures expected of them by their supervisors. Isolated testimony that some paramedics were confused on the lifespan of the PIT directive is not sufficient to carry a claim for failure to train under § 1983.

Lastly, the record does not provide any evidence that Chief Davis or Dr. Freid acquiesced to any alleged constitutional deprivations. There is no evidence that would indicate they were aware constitutional violations may have been occurring within the Department and were nonetheless complacent. There is no record of repeat constitutional offenses at KCFD, no proof of workplace rumors, and no similar incidents. When KCFD became aware of Engler and Dustin's actions, they were punished.

Plaintiffs have failed to demonstrate an issue of fact with respect to Chief Davis and Dr. Freid's liability as supervisors under § 1983. Summary judgment is granted in Defendants' favor on Plaintiffs' Third Claim for Relief.

**IV.    Fourth and Fifth Claims for Relief: violations of Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act against KCFD.[6]**

All Plaintiffs allege that Defendant KCFD violated Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act by enforcing discriminatory policies and failing to adequately train personnel in responding to disabled patients.

---

[6] Plaintiffs' ADA and § 504 claims are analyzed together "because there is no significant difference in the analysis of rights and obligations created by the two Acts." *Vinson v. Thomas*, 288 F.3d 1145, 1152 n. 7 (9th Cir. 2002) (quoting *Zukle v. Regents of the University of California*, 166 F.3d 1041, 1045 n. 11 (9th Cir.1999)); *see also Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 n. 8 (9th Cir. 1999).

Title II of the Americans with Disabilities Act ("ADA") was modeled after § 504 of the Rehabilitation Act ("RA"). *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). Both Acts protect qualified individuals with disabilities from discrimination on the basis of disability in services, programs, and activities provided by public entities. 42 U.S.C. § 12132; 29 U.S.C. § 794.

To prevail on a Title II claim, a plaintiff must show that she faced discrimination "by reason of [her] disability." *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1021 (9th Cir. 2010). To prevail on a § 504 claim, a plaintiff must show that she was "denied the benefits of the program solely by reason of her disability." *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007). "Both Title II of the ADA and § 504 of the RA prohibit discrimination because of disability, not because of inadequate treatment for disability." *E.g., Fetter v. Bonner*, No. 2:12-cv-02235-GEB-EFB, 2014 U.S. Dist. LEXIS 113145, *10 (E.D. Cal. Aug. 13, 2014) (cleaned up and original citations omitted).

Plaintiffs here claim that Ms. Vaughn's Covid-19 diagnosis constitutes a qualifying disability within the meaning of the ADA and RA. They further argue that KCFD Defendants discriminated against Ms. Vaughn in violation of the ADA and RA by denying her treatment and transport because of her disability.

Without reaching the question of whether Ms. Vaughn was, for ADA or RA purposes, disabled by Covid-19, the Court finds that Plaintiffs' claims fail for lack of any proof that unlawful discrimination occurred. The record demonstrates, and Defendants Engler and Davis have further acknowledged, that their response to Ms. Vaughn was influenced by directives that prioritized heightened safety protocols applied equally towards all Covid-positive patients. Those directives were motivated by reducing risk and mitigating exposure to a lethal virus, not

unlawful discriminatory animus. Public entities are permitted to "impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities," provided that those "safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 CFR § 35.130(h). Where a public entity, like KCFD, faces a rapidly changing landscape of developments regarding a novel, highly contagious virus, it is well within its right to implement precautions that prioritize the safety of first responders, even if they treat certain groups of patients differently from others.

For the same reasons, Ms. Kimbol's claims for associational discrimination also fail. *See* ECF No. 69 at 36–37.

Summary judgment is granted in Defendants' favor on Plaintiffs' Fourth and Fifth Claims for Relief.

## V.    Sixth, Seventh, Eighth, and Tenth Claims for Relief: various negligence claims and wrongful death against all Defendants.

Plaintiffs assert a wrongful death action against Defendants for the death of Ms. Vaughn under three theories of medical malpractice: negligence, gross negligence/reckless misconduct and negligence/lost chance. Defendants move for summary judgment on the family members' individual claims.

Oregon Revised Statute 30.020 allows the personal representative of a decedent's estate to bring an action against the defendant that allegedly caused the decedent's death, if the decedent might have maintained the action had the decedent lived. *Martineau v. McKenzie-Willamette Med. Ctr.*, 371 Or. 247, 275 (2023). The cause of action is "derivative" of the decedent's rights, meaning it "places a decedent's personal representative in the decedent's shoes, imputing to the personal representative whatever rights, and limitations to those rights, that the decedent possessed." *Union Bank of California, N.A. v. Copeland Lumber Yards, Inc.*,

213 Or. App. 308, 315 (2007) (quoting *Storm v. McClung*, 334 Or. 210, 223 (2002)). The wrongful death cause of action is entirely statutory and has no basis in the common law. *Hughes v. PeaceHealth*, 344 Or. 142, 147, 178 P.3d 225, 229 (2008). A plaintiff must allege facts which bring her state law claims within ORS 30.020, or the claims fail as a matter of law. *Demars v. Erde*, 55 Or. App. 863, 866, 640 P.2d 635 (1982).

Plaintiffs here appear to concede that their negligence claims are subsumed by the wrongful death statute.[7] Therefore, only the personal representative of the Estate may bring the wrongful death action and the negligence claims asserted in the Sixth, Seventh, Eighth, and Tenth Claims for Relief. *See Horwell by Penater v. Oregon Episcopal Sch.*, 100 Or. App. 571, 574 (1990). Defendants' motion for partial summary judgment is therefore granted with respect to the family members' individual state law claims.

### a. The Estate's negligence claim

KCFD Defendants have acknowledged that the Estate has valid common law claims against them for medical malpractice and wrongful death. ECF No. 62 at 8. The following addresses Defendant Dr. Freid's motion for summary judgment on all state law claims asserted against him.

A medical malpractice claim requires a plaintiff to prove: "(1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff measurable in damages; and (4) causation, *i.e.,* a causal link between the breach of duty and the harm." *Zehr v. Haugen*, 318 Or. 647, 653–54 (1994); *see also Rustvold v. Taylor*, 171 Or. App. 128, 132 (2000).

---

[7] "Plaintiffs will dismiss the statutory claims by individual family members for Teresa Vaughn's wrongful death. Plaintiffs acknowledge that the Estate of Teresa Vaughn is the only party who can bring a wrongful death action in Oregon." ECF No. 70 at 6.

The Estate contends that "its expert testimony establishes that Dr. Freid breached his duty to monitor and supervise his EMTs and whether and how those EMTs carried out his policies." ECF No. 70 at 6. According to the Estate, Dr. Freid allowed directives that contradicted his protocols, causing EMTs to carry out discriminatory actions which proximately caused Ms. Vaughn's death and would have been prevented had Dr. Freid not breached his duty to train, monitor, and supervise. *Id.* This argument is not supported by the record.

Even assuming the Estate is correct that the PIT directive came from Dr. Freid and even accepting the expert testimony of Dr. Freedman, the Estate has failed to show, with any probative evidence, how Dr. Freid's actions can be causally linked Ms. Vaughn's death. Multiple times now Plaintiffs have alleged that Dr. Freid "allowed, approved, and ratified policies." However, those policies remain vague and unsupported. There is nothing in the record from which a jury could reasonably conclude that Dr. Freid allowed, approved, or ratified any policies or customs which would have resulted in a failure to properly treat Ms. Vaughn or a failure to transport her. It is undisputed that Ms. Vaughn's harm did not arise out of a policy; it arose out a failure to adhere to policy.

To the extent the Estates attempts to prevail on a medical malpractice claim solely for Dr. Freid's failure to train and oversee his captains, the same weakness is found. There is simply insufficient proof in the record to support a conclusion that Dr. Freid was negligent in a way that directly caused harm to Ms. Vaughn. Not only has the Estate failed to show that there was a standard of care that Dr. Freid breached by not attending "ride-alongs," but the Estate has also failed to show that but for his failure to attend, Ms. Vaughn would have been treated and transported on December 26. The causal connection the Estate attempts to extend all the way to

Dr. Freid, who was not present and did not personally participate in the events in question, is too tenuous to support.

Without proof that Dr. Freid's conduct was a breach of his duty which directly caused Defendants Engler and Dustin not to treat or transport Ms. Vaughn, the Estate's claim for medical malpractice against Dr. Freid cannot survive summary judgment.

> ### b. *The Estate's claims for gross negligence/reckless misconduct and negligence/lost chance*

The Estate also alleges claims for gross negligence/reckless misconduct and negligence/lost chance against Dr. Freid, but these claims fail for similar reasons. The factual allegations raised by the Complaint in support of these two claims pertain only to the treatment of Ms. Vaughn on the night in question. Accordingly, these claims fail to allege any actions that are specifically attributable to Dr. Freid. The record similarly cannot support a finding of gross negligence or lost chance with respect to Dr. Freid in his role as Medical Director of KCFD.

In its Response, the Estate merely states: "Plaintiffs hereby incorporate their points and authorities in opposition to Freid's Motion 3 in regard to opposition to this Motion 4." Given that the Estate has failed to demonstrate any genuine issue of material fact with respect to these claims, the Court grants Dr. Freid's motion in this respect as well.

Summary judgment is granted in Dr. Freid's favor on the Sixth, Seventh, Eighth, and Tenth Claims for Relief.

## VI.   Ninth Claim for Relief: intentional or negligent infliction of emotional distress against all Defendants, except Dr. Freid.

Plaintiffs allege that KCFD Defendants intentionally or negligently inflicted emotional distress on the Vaughn family in the following respects: failing and refusing to provide Ms.

Vaughn treatment, failing and refusing to provide Ms. Vaughn transport, and purposefully and knowingly misleading the family about Ms. Vaughn's medical information.

### a. IIED

A claim for intentional infliction of emotional distress ("IIED") requires a plaintiff to show the defendant's acts were an "extraordinary transgression of the bounds of socially tolerable conduct," that caused severe emotional distress to plaintiff, intentionally. *Giulio v. BV CenterCal, LLC*, 815 F Supp 2d 1162, 1180 (D. Or. 2011) (citing *Madani v. Kendall Ford, Inc.*, 312 Or. 198, 203 (1991)). The conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citing *Christofferson v. Church of Scientology of Portland*, 51 Or App 203, 211 (1982)). Acting "merely rude, boorish, tyrannical, churlish and mean does not satisfy that standard, nor do insults, harsh or intimidating words, or rude behavior ordinarily result in liability even when intended to cause distress." *Watte v. Edgar Maeyens, Jr., MD., PC*, 112 Or. App. 234, 239 (1992). The determination of whether alleged conduct is sufficiently extraordinary is a question of law for the court. *Giulio*, 815 F Supp.2d at 1180.

The record here cannot support a claim for IIED. First, the alleged conduct on which Plaintiffs' hang this claim is not sufficiently outrageous. To the degree Plaintiffs reassert the previously dismissed allegations regarding Defendants' tortious mishandling of public records, the Court's previous reasoning applies with equal force: those acts do not rise to the level of extraordinary transgression required by a claim for IIED. *See* Findings and Recommendation, ECF No. 20 (dismissing Plaintiffs' IIED claim against Defendant Hedlund).

As to the allegations regarding Defendants' conduct in failing to treat or transport Ms. Vaughn, the same can be said. The allegations reflect two paramedics failing to act professionally

and fulfill their duties. They do not make out the "callous refusal" that Plaintiffs assert raises "to an extraordinary transgression beyond the bounds of socially tolerable conduct." ECF No. 69 at 38. There is also nothing in the record to indicate that Defendants acted with the requisite intent or desire to inflict severe emotional distress on Plaintiffs.

### b. NIED

Plaintiffs also raises a claim for negligent infliction of emotional distress ("NIED") in their Complaint and, confusingly, in their Response to Dr. Freid—the sole Defendant this claim is not alleged against. *See* ECF No. 70 at 8–12; *see also* SAC, ECF No. 59 at 27.

A bystander can prevail on a claim for NIED in Oregon by demonstrating that the bystander contemporaneously witnessed a serious physical injury to a close family member that was caused by the defendant's negligence and resulted in severe emotional distress to the bystander. *Philibert v. Kluser*, 360 Or. 698, 712–13 (2016).

Here, only Ms. Kimbol witnessed the events that caused Ms. Vaughn's injury as they occurred. *See Philibert*, 360 Or. at 713 ("This contemporaneous perception is at the core of the bystander's action for damages. Observation of the scene of an accident after it has happened, or perceiving a recently injured person, does not meet this requirement.") And although what Ms. Kimbol endured was undeniably a horrible experience, witnessing a loved one lose consciousness and suffer a cardiac event does not alone raise to the level of severity required by this cause of action.

Without case law demonstrating that similar facts have prevailed on a claim for NIED in this district, the record cannot support a claim for NIED.

Summary judgment is granted in Defendants' favor on Plaintiffs' Ninth Claim for Relief.

**VII.    Eleventh Claim for Relief: survival action against all Defendants.**

Plaintiffs concede that their survival action fails to allege a legally cognizable claim. ECF No. 70 at 6. Summary judgment is granted in Defendants' favor on the Eleventh Claim for Relief.

### CONCLUSION

For the above reasons, the Motion for Summary Judgment submitted by Defendants Klamath County Fire District No. 1, Gregory Davis, Cody Engler, and Alex Dustin (collectively, "KCFD Defendants"), ECF No. 62, and the Motion for Summary Judgment submitted by Defendant Dr. Freid, ECF No. 63 are granted and denied in part.

All Defendants are entitled to judgment in their favor on the following claims: the Second, Third, Fourth, Fifth, Ninth, and Eleventh Claims for Relief. Dr. Freid is entitled to judgment in his favor on the Sixth, Seventh, Eighth, and Tenth Claims for Relief. Summary judgment is denied with respect to Plaintiffs' First Claim for Relief, against Engler and Dustin, and Marjo Vaughn, Richard Vaughn, Sr., and the Estate's Sixth, Seventh, Eighth, and Tenth Claims for Relief, against KCFD Defendants. Dr. Freid is accordingly dismissed from this action. The matter will not be remanded to state court.

DATED this _19_ day of _April_, 2024.

MARK D. CLARKE
United States Magistrate Judge