IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

RICHARD VAUGHN Sr., RICHARD
VAUGHN Jr. *Individually and as
Personal Representative for The Estate
of Teresa Vaughn, Deceased*, MARJO
VAUGHN, LARRY VAUGHN, DEBRA
BLANK, and VIVIAN KIMBOL,

Plaintiffs,

v.

KLAMATH COUNTY FIRE DISTRICT
No. 1 *an Oregon Special District*,
GREGORY DAVIS, CODY ENGLER,
and ALEX DUSTIN,

Defendants.

Case No. 1:22-cv-00161-CL

**OPINION AND ORDER**

CLARKE, Magistrate Judge.

Plaintiffs represent the family and Estate of now-deceased Teresa Vaughn. They bring this action against Defendants Klamath County Fire District No. 1 ("KCFD"), Gregory Davis, Cody Engler, and Alex Dustin (collectively, "Defendants") for claims arising out of a 911 response. Before the Court is Defendants' Joint Motion for Judgment as a Matter of Law ("JMOL"), ECF No. 203. Defendants renew their motion for JMOL on the Estate's section 1983 claim against Engler and Dustin and on Plaintiffs' negligent supervision and training claims against KCFD. For the reasons below, Defendants' Motion is DENIED.

//

## BACKGROUND

This case arises out of the death of Teresa Vaughn ("Ms. Vaughn"). Plaintiffs are Richard Vaughn, Jr. (decedent's brother and personal representative of her Estate), Vivian Kimbol (domestic partner), Marjo Vaughn (mother), Richard Vaughn, Sr. (father), Larry Vaughn (brother), and Debra Blank (sister). SAC, ECF No. 59 at ¶ 7.

Ms. Vaughn tested positive for Covid-19 on December 21, 2020. Mylander Decl., ECF No. 71-1 at 12, 14.[1] Her partner, Ms. Kimbol, tested negative. *Id.* Ms. Vaughn's symptoms remained generally mild until the morning of December 26, at which point they appeared to escalate dramatically. *Id.* at 15. According to Ms. Kimbol, Ms. Vaughn awoke with difficulty breathing and she struggled to navigate the stairs of their apartment, unable to grip her water bottle and purse and requiring Ms. Kimbol's assistance. *Id.* After setting Ms. Vaughn down in a chair to call her sister, Ms. Kimbol called 911. *Id.* at 16. She told the dispatcher her "roommate was having difficulty breathing, and that she had tested COVID positive, and that [they] needed 9-1-1." *Id.* at 17. Ms. Kimbol contends that Ms. Vaughn was gasping on the phone with her sister, only able to respond with an "uh-huh" or a "yes." *Id.*

KCFD paramedic, Defendant Cody Engler, arrived five to ten minutes later in personal protective equipment. *Id.* at 18-19. He claims Ms. Kimbol communicated through the door that Ms. Vaughn had Covid for a week, was feeling shaky, and wanted to go to the hospital to get checked out. ECF No. 71-3 at 13. Ms. Kimbol placed masks on herself and Ms. Vaughn, and Engler entered the apartment enough to glance at Ms. Vaughn in the chair. ECF No. 71-1 at 20. His account of Ms. Vaughn's condition differs from Ms. Kimbol's. Engler claims that from looking at Ms. Vaughn and briefly speaking to her, he was able to conclude there were no signs of respiratory

---

[1] Page numbers correspond to ECF pagination.

distress or increased respiratory rate, she was not tripoding or breathing shallow, and her skin showed positive signs of being pink, warm, and dry. ECF No. 71-3 at 13. Engler asked a few questions about Ms. Vaughn's symptoms and condition, and he inquired as to how she got down the stairs, to which Ms. Kimbol answered that she assisted. ECF No. 71-1 at 22- 23. It's unclear exactly when he raised it, but at some point early into the visit Engler asked Ms. Kimbol if she was willing to drive Ms. Vaughn to the hospital in her own vehicle, claiming it was encouraged at the time to limit exposure. *Id.* at 20; ECF No. 71-3 at 16. Ms. Kimbol contends she responded: "Isn't that your fucking job? I wouldn't have called you." ECF No. 71-1 at 21. Additionally, at some point during this initial encounter, Engler canceled the oncoming engine en route with defibrillators, medical equipment, and three more senior paramedics. ECF No. 71-3 at 27-28.

A second KCFD paramedic, Defendant Alex Dustin, came to the doorway with a medical bag. ECF No. 71-1 at 24, 39. Engler stopped Dustin from entering and explained that Ms. Kimbol would be providing transport. *Id.* at 24. Engler verbally confirmed with Ms. Vaughn that it was alright for Ms. Kimbol to take her, to which she responded, "I guess so." *Id.* at 25. The two women then got up and headed out of the apartment with Ms. Kimbol physically supporting Ms. Vaughn the entire way. *Id.* at 26. As they approached the car, Ms. Vaughn dropped to the step and started to fall sideways. *Id.* Dustin steadied her and helped walk Ms. Vaughn the rest of the way to her car. *Id.* He put her seatbelt on and retrieved her slipper, which had fallen off in the process. *Id.* Once the women were in their car, Engler and Dustin got back into the ambulance. Ms. Kimbol began driving towards the hospital; the paramedics began driving the opposite direction. *Id.* at 27.

Approximately three-tenths of a mile down the road, Ms. Vaughn suffered a cardiac event. *Id.* at 29. She and Ms. Kimbol arrived at the emergency room approximately eight minutes later, at which point Ms. Vaughn had lost consciousness and wasn't breathing. *Id.* at 30. Hospital

Page 3 – Opinion and Order

personnel met the car in the ambulance bay, retrieved Ms. Vaughn, and began administering CPR and oxygen. *Id.* at 31. Ms. Vaughn's brother and sister arrived later, but Ms. Kimbol, not permitted to enter the hospital due to her Covid-19 exposure, returned home alone. *Id.* at 31-32. The doctors were able to revive Ms. Vaughn, but they could not keep her alive without ventilator support. *Id.* at 33. The family, with Ms. Kimbol's counsel, made the decision to end life support a short while later. *Id.*

## PROCEDURAL BACKGROUND

Plaintiffs' complaint was originally filed on January 31, 2022. By the time of trial, two claims remained.

First, the Estate of Teresa Vaughn alleged Defendants caused Ms. Vaughn's death under Oregon's wrongful death law. Second, the Estate and Ms. Vaughn's parents alleged Engler and Dustin violated the Fourteenth Amendment of the United States Constitution by being deliberately indifferent to a known danger they themselves caused. The Estate of Teresa Vaughn and her parents sought economic and noneconomic damages alleging the defendants caused the death of Teresa Vaughn. Defendants denied both claims and denied that their actions were the cause of Ms. Vaughn's death.

A two-week jury trial was held in Medford, Oregon beginning on June 4, 2025. On the third day of deliberation, the jurors notified the Court that they were unable to reach a verdict. A mistrial was declared.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a)," then "no later than 28 days after the jury was

discharged . . . the movant may file a renewed motion for judgment as a matter of law[.]" Fed. R. Civ. P. 50(b).

"Judgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion." *Santos v. Gates*, 287 F.3d 846, 851 (9th Cir. 2002). In other words, "[a] motion for a judgment as a matter of law is properly granted only if no reasonable juror could find in the non-moving party's favor." *El-Hakem v. BJY, Inc.*, 415 F.3d 1068, 1072 (9th Cir. 2005). "The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205-06 (9th Cir. 2008) (quotation omitted). "If conflicting inferences may be drawn from the facts, the case must go to the jury." *LaLonde v. Cty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000).

## DISCUSSION

Defendants renew their motion for JMOL on the Estate's section 1983 claim against Engler and Dustin and on Plaintiffs' negligent supervision and training claims against KCFD. The Court previously denied this motion during trial. ECF No. 187. Because Defendants fail to raise any new facts, law, or argument on the issue, the Court once again denies the motion.

**I.    JMOL is denied on the Estate's section 1983 claim against Engler and Dustin.**

Defendants argue JMOL is appropriate on the Estate's section 1983 claim because the Estate has failed to show that Engler and Dustin are not entitled to qualified immunity. The Court disagrees.

### a. Section 1983

A Section 1983 claim requires a plaintiff must show (1) a violation of a (2) constitutional right (3) committed by a person acting under color of state law. *Anderson v. Warner*, 451 F.3d

1063, 1067 (9th Cir. 2006). Plaintiffs here claim that Defendants violated the Fourteenth Amendment, which provides "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

The Due Process Clause of the Fourteenth Amendment acts "as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).

Consistent with these principles, the general rule is that a state is not liable for its omissions. *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000). However, a state's "omission or failure to protect" may violate the Fourteenth Amendment if one of two exceptions apply. *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971-72 (9th Cir. 2011). Plaintiffs here rely on the state-created danger exception.

### b. State-created danger

The state-created danger exception arises "when the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger.'" *Id.* Thus, to survive JMOL, Plaintiffs must raise a question of fact as to whether Defendants Engler and Dustin (1) affirmatively placed Ms. Vaughn in danger (2) by acting with deliberate indifference to a foreseeable risk. The Court finds they have.

First, in examining whether the state affirmatively placed a person in danger, we examine whether the state actor "left the person in a situation that was more dangerous than the one in which they found him." *Munger*, 227 F.3d at 1086. Plaintiffs here claim Engler and Dustin acted

affirmatively in the following ways: signaling to Dustin not to proceed into the house with medical instruments or conduct any further examination on Ms. Vaughn; canceling the oncoming engine equipped with superior aid, tools, and experienced EMS workers; walking Ms. Vaughn 25 feet to her car, when she was visibly stumbling and unable to ambulate independently; and driving the ambulance in the opposite direction rather than following Ms. Vaughn and Ms. Kimbol to the hospital, as was standard procedure. Interpreting these facts in the manner most favorable to Plaintiffs, reasonable minds could differ as to whether these were affirmative state actions that resulted in Ms. Vaughn being placed in arguably the least equipped situation with the farthest access to medical aid following harmful, unnecessary physical exertion.

Defendants argue that the referenced conduct is more properly framed as inaction, or a failure to act, rather than actual affirmative action. In *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997), the decedent was found in grave medical condition and the officers nonetheless moved him inside, locked the door, and left. That was a clear example of affirmative state action creating a danger. To Defendants' point, the Court agrees that the facts of this case do not present as clear an example as *Penilla*. However, they also do not present a clear antithesis, where the defendants merely do nothing upon arrival. The testimony is undisputed that Engler and Dustin did not merely show up and leave; they took some active steps which resulted in a change in circumstances for Ms. Vaughn. It is arguable that, like *Penilla*, Defendants' actions cut Ms. Vaughn off from receiving immediate medical attention. Further, a dispute exists as to the degree of those steps, such as how much of a visual assessment was or was not made by Engler and how poor or alarming Ms. Vaughn's condition was upon arrival. Ms. Kimbal also asserts that had Engler not encouraged them to transport themselves as he did, she would have pursued other medical aid through her employing hospital, thereby avoiding the car ride but for Engler's encouragement. In

Page 7 – Opinion and Order

light of such dispute, the Court finds that Plaintiffs have raised a genuine question as to whether Engler and Dustin's conduct crossed from mere inaction into affirmative action that placed Ms. Vaughn in a worse circumstance than she otherwise would have found herself in.

The second step for the exception to apply examines whether the state acted with "deliberate indifference" to a "known or obvious danger." *Patel*, 648 F.3d at 974. Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). The state actor must recognize the unreasonable risk and intend to expose the person to it, without regard to any consequences to the person. *Sinclair v. City of Seattle*, 61 F.4th 674, 680 (2023). "The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state." *Patel*, 648 F.3d at 974.

Plaintiffs here have presented evidence that Engler and Dustin knew of Ms. Vaughn's Covid-19 diagnosis, were responding to her 911 call requesting urgent assistance, saw her in a state where she could barely breath or walk on her own, and still, they chose to cut off further aid and abandon Ms. Vaughn and Ms. Kimbol. Drawing all inferences in Plaintiffs' favor, reasonable minds could differ regarding whether Defendants actions rose beyond mere negligence to deliberate indifference to the known danger presented by Ms. Vaughn's condition. The Court is further mindful that the danger and uncertainty surrounding Covid-19 in December 2020 was significantly heightened compared to our current understanding in 2025.

### c. Qualified immunity

At the crux of Defendants' motion for JMOL is the argument that the Estate has failed to show that Engler and Dustin are not entitled to qualified immunity.

A plaintiff attempting to overcome the presumption of qualified immunity must first show the constitutional right was clearly established. *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994). The burden then shifts to the defendant to show that a reasonable state actor "could have believed, in light of the settled law, that he was not violating a constitutional or statutory right." *Id.* "Summary judgment on qualified immunity is not proper unless the evidence permits only one reasonable conclusion. Where 'conflicting inferences may be drawn from the facts, the case must go to the jury.'" *Munger*, 227 F.3d at 1087 (quoting *Lalonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000)).

While the particular facts of this case present a somewhat novel application of the state-created danger exception, the right to be free from state-created danger is, and has been, a clearly established constitutional right. Given the possibility of conflicting inferences, the Court declines to grant Defendants qualified immunity as a matter of law. Moreover, significant disputes of fact exist in this case creating uncertainty as to whether Engler and Dustin knew of the danger they were creating with their actions.

There is sufficient evidence to lead a reasonable juror to find that qualified immunity does not apply here. Defendants' motion for JMOL on this claim is therefore denied.

## II.   JMOL is denied on Plaintiffs' negligent supervision and training claims against KCFD.

Defendants next argue that Plaintiffs have failed to present any evidence demonstrating negligent supervision or training by KCFD. Once again, the Court disagrees.

Oregon law recognizes direct negligence claims against public employers for failing to supervise employees who commit foreseeable harm. "[L]iability attaches when an employer negligently places an employee with known dangerous propensities, or dangerous propensities

which could have been discovered by a reasonable investigation, in a position where it is foreseeable that he could injure the plaintiff in the course of the work." *Branford v. Wash. Cty.*, No. 3:17-cv-94-SI, 2019 WL 1957951, at *21 (D. Or. May 2, 2019) (cleaned up).

KCFD's systemic failures contributed to Teresa's death. Engler claims he misunderstood a "Provider-Initiated Refusal" policy. If it existed, it would only allow for non-transport of Covid-positive patients in very limited circumstances – after a full evaluation including vital signs. According to KCFD leadership, the policy was never a license to discourage people from going to the hospital in an ambulance if they wanted to. Whatever the policy was, it was poorly communicated, giving paramedics like Engler and Dustin an excuse to refuse service to patients in need.

Additionally, KCFD leadership failed to enforce review mechanisms for EMTs' run reports. Reports indicating refusals to transport Covid-positive patients, such as Engler's prior incidents, went unchecked. Had KCFD's captains and battalion commanders conducted proper reviews as Chief Davis expected of them, they could have identified and corrected this dangerous practice before Teresa's death.

Plaintiffs have presented sufficient evidence for a jury to find in their favor on the negligent supervision and training claims against KCFD. Defendants' motion for JMOL on this claim is therefore denied.

## ORDER

Defendants' Joint Motion for Judgment as a Matter of Law, ECF No. 203, is DENIED.

It is so ORDERED and DATED this 18 day of August, 2025.



MARK D. CLARKE
United States Magistrate Judge